## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | | |
|---|---|---|---|
| SHARON KAY PRINGLE | | : | |
| | Plaintiff, | : | |
| v. | | : | C. A. No. 08-503-GMS |
| MICHAEL ASTRUE,<br>COMMISSIONER OF<br>SOCIAL SECURITY, | | : | |
| | Defendants. | : | |

### **MEMORANDUM**

### I. **INTRODUCTION**

On August 11, 2008, plaintiff Sharon Kay Pringle ("Pringle") appealed from a

decision of Michael J. Astrue, the Commissioner of Social Security (the

"Commissioner"), denying her application for disability insurance benefits ("DIB") and

supplemental security income ("SSI") under Titles II and XVI of the Social Security Act

(the "Act"), 42 U.S.C. §§ 401-433m, 1381-1383f. This Court has jurisdiction over the

matter pursuant to 42 U.S.C. § 405(g).

Presently pending are cross-motions for summary judgment filed by Pringle and

the Commissioner. (D.I. 21, 26.) Pringle seeks an award of benefits in her favor or,

alternatively, to reverse and remand the Commissioner's decision. (D.I. 21.) The

Commissioner requests affirmance of his decision. (D.I. 26.) For the reasons set forth

below, Pringle's motion is granted, and the Commissioner's motion is denied. The

decision of the Administrative Law Judge is reversed, and this matter is remanded for

further findings and/or proceedings consistent with this Memorandum.

## II. BACKGROUND

On September 24, 2003, Pringle filed applications for Title II Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security Income ("SSI"). (D.I. 10 at 16.) Pringle claimed she had been disabled since November 3, 2002. (*Id.*) Following the Social Security Administration's ("SSA") denial of her claim, both initially and upon reconsideration, Pringle requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 33, 38, 43.) A hearing before ALJ, Keith A. Stanley, occurred on May 9, 2005. (*Id.* at 488.) At the hearing, the ALJ heard testimony from Pringle and a vocational expert ("VE"), Lisa Keen. (*Id.* at 487.) On July 19, 2005, the ALJ issued his decision denying Pringle's claim for benefits, concluding she was not disabled under sections 216(I) and 223 of the Social Security Act. (*Id.* at 25-26.) Subsequently, the Appeals Council denied Pringle's request for review. (*Id.* at 8.) Thereafter, she appealed the ALJ's decision to the United States District Court for the District of Kansas. (*Id.* at 408.) After finding the ALJ erred in weighing the medical opinions, the court reversed and remanded the ALJ's findings for further consideration. (*Id.* at 431.)

On August 25, 2005, Pringle filed a second set of applications for DIB and SSI benefits, which claimed she had been disabled since July 19, 2005. (*Id.* at 442.) The SSA again denied Pringle's claims, both initially and upon reconsideration, and Pringle subsequently requested a hearing before an ALJ. (*Id.*) The ALJ, Edward Banas, conducted a hearing on July 19, 2007, hearing testimony from Pringle, a VE, Jan D. Howard-Reed, and Pringle's future daughter-in-law, Dawn Barresi ("Barresi").[1] (*Id.*)

---

[1] Two different spellings for Barresi are in the record. For consistency, this court is using the spelling contained in the transcript of the hearing.

The ALJ found Pringle had been disabled within the meaning of 216(I) and 223(d) of the Act since May 17, 2007. (*Id.* at 453.) However, the District Court's remand order required further consideration of all medical opinions in the record, beginning on November 3, 2002. (*Id.* at 390.) Thus, ALJ Banas held another hearing on April 8, 2008, where he heard testimony from Pringle, a VE, Christina L. Beatty-Cody, and Barresi. (*Id.*) On April 18, 2008, the ALJ reaffirmed Pringle was disabled as of May 17, 2007, but found Pringle was not disabled before that date. (*Id.* at 403.) After the ALJ's decision became final, Pringle filed the present appeal under consideration to challenge the ALJ's finding regarding her disability status prior to May 17, 2007. (D.I. 21.)

## A. Medical Evidence

To support her claim, Pringle produced medical records regarding her conditions. The Court will summarize the relevant records.

### 1. Dr. David E. Brown, D.O. (2/18/02-3/25/02) & Miami County Medical (12/28/02-3/6/03)

Dr. Brown diagnosed Pringle with epigastric abdominal pain and chronic dyspepsia on January 2, 2002 after she complained of severe abdominal pain that required a visit to the emergency room one week prior. (D.I. 10 at 190.) Dr. Brown found a large incarcerated ventral hernia, and diagnosed gastroesophageal reflux disease and hemorrhagic gastritis, and recommended Prilosec therapy. (*Id.* at 188.) He performed a ventral incarcerated herniorrhaphy to repair the ventral hernia on February 12, 2002. (*Id.* at 164.) Pringle had "significant incisional pain" for six days following the surgery. (*Id.*) Five weeks after the surgery, Dr. Brown reported she was "progressing extremely well," and Pringle did not return for additional post-operative check-ups. (*Id.* at 162.)

3

## 2. Dr. Mark Holscher (1/28/02-10/15/03)

Dr. Holscher was Pringle's treating physician from January 28, 2002 through October 15, 2003 (*Id.* at 252.) His annotations during office visits show GERD, hypothyroidism, abdominal pain, diarrhea, and fibromyalgia. (*Id.* at 258, 261.) Pringle's correspondence with Dr. Holscher's office detail ongoing complaints about stomach pain and swelling. (*Id.* at 259, 263-64.) During a telephone conversation on September 24, 2003, Pringle requested temporary disability, and on forms later submitted to the SSA, she listed Lactinex, Cholestyramine, Claritin, Singulair, and an albuterol inhaler as the medications Dr. Holscher prescribed. (*Id.* at 259,131.) In an undated memo, Dr. Holscher stated Pringle was "unable to search for employment effectively at this time." (*Id.* at 267.)

## 3. Dr. Christopher Nichols, M.D. (4/14/03-6/4/03)

Dr. Holscher referred Pringle to Dr. Nichols, a gastrointestinal specialist, who examined her on April 14, 2003, and noted diffuse upper abdominal bloating, distention, and acid reflux. (*Id.* at 235.) His report states Pringle has suffered from bloating and distention since fall of 2002. (*Id.*) His examination revealed clear lungs, a regular heart rate and rhythm, and mild depression. (*Id.* at 236.) In subsequent office visits, Pringle complained of unchanged continual abdominal pain since beginning the Prilosec regimen. Dr. Nichols diagnosed diverticulitis. (*Id.* at 233.) Diverticulitis had been previously diagnosed during an emergency room visit on July 21, 2002 for severe stomach pain, which resulted in four day hospital admission. (*Id.*)

4

### 4. Dr. Cedric B. Fortune, M.D. (Kansas Consultative Examination) (12/11/03)

On December 11, 2003, Dr. Fortune conducted a state consultative physical examination of Pringle. (*Id.* at 268.) Dr. Fortune noted asthma, ongoing heartburn, all-over body pain, gastrointestinal issues, postural problems bending or stooping, and lower back discomfort in his summary of her medical history. (*Id.*) He noted normal heart and lung functions and an unremarkable liver, spleen, and kidney were reported. (*Id.*) Dr. Fortune's orthopaedic exam revealed Pringle had no difficulty getting on or off the exam table, exhibited normal range of motion, and mild difficulty walking on her heels and toes. (*Id.* at 269.) He noted her efforts during the orthopaedic exam were poor. (*Id.*) He reported Pringle was "alert and oriented to time, place, and situation." (*Id.* at 269.) He did, however, conclude she embellished her symptoms. (*Id.*) His diagnoses included shortness of breath with asthma, low back pain, reflux esophagitis, generalized arthralgia, and obesity. (*Id.*) Despite these diagnoses, Dr. Fortune found Pringle could "perform reasonable activities, including sitting, standing, walking and lifting," but noted difficulty standing for more than ten minutes. (*Id.*)

### 5. RFC Assessment (12/17/03)

A state medical examiner subsequently relied on Dr. Fortune's findings to determine Pringle's Residual Functional Capacity ("RFC"). (*Id.* at 270.) Regarding exertional limitations, the examiner[2] found she could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand, walk or sit for about six hours in an eight hour workday. (*Id.* at 271.) Concerning postural limitations, the

---

[2] Although the signature is unclear, it appears this state examiner was Tom Hawkins, M.D.

5

examiner assessed Pringle could only occasionally climb, but could frequently balance, stoop, kneel, crouch, and crawl. (*Id.* at 272.) The examiner found no manipulative, visual, or communicative limitations. (*Id.* at 273-74.) Based on her asthma, the examiner did indicate she should avoid exposure to fumes, odors, dusts, gases, and the like. (*Id.* at 274.) Following the medical examination report, Dr. Jeffrey L. Wheeler, another state medical examiner, reviewed these findings and agreed with all noted limitations. (*Id.* at 278-79.)

### 6. Dr. Brian Hunt, M.D. (5/1/03-4/22/04)

Pringle's principal complaint while under Dr. Hunt's care related to diarrhea. (D.I. 10 at 396.) Dr. Hunt also prescribed medication to treat Pringle's depression. (*Id.*) Dr. Hunt's treatment notes reference a fibromyalgia diagnosis, but do not explain the origins or reasoning for that diagnosis. (*Id.*)

### 7. Dr. Stanley Mintz (Psychological Evaluation 6/30/04)

Dr. Mintz performed a mental status examination on behalf of Disability Determination Services ("DDS") on April 23, 2004. (D.I. 15 at 303.) In reviewing Pringle's health issues, Dr. Mintz noted stomach tenderness and swelling, fibromyalgia, hiatial hernia, allergies, asthma, depression, and daily diarrhea. (*Id.*) He described "some inconsistency in terms of the medical complaints she mentions" and felt she "may be augmenting medical and psychological complaints." (*Id.*) Pringle disclosed her primary care physician at the time, Dr. Hunt, had prescribed Zoloft and related increased depression since finding her deceased mother in their home. (*Id.*) Dr. Mintz recorded Pringle's daily activities as taking her children to school, cleaning, and cooking. (*Id.* at 304.) During the examination, he reported Pringle was "somewhat

6

slovenly in appearance" and did not appear "recently brushed or groomed." (*Id.*) His other impressions of Pringle included dependency, tendency to "externalize blame," lack of work motivation, and entitlement to disability. (*Id.*) Dr. Mintz concluded Pringle "appears capable of being able to relate reasonably well to co-workers and supervisors," can understand "simple and intermediate instructions," and can adequately concentrate on tasks. (*Id.* at 305.)

Dr. Lauren Cohen reviewed Dr. Mintz's examination to determine Pringle's psychological limitations. (*Id.* at 308.) She categorized Pringle's limitations as not severe, but noted Pringle suffered from depressive disorder and dependent personality disorder. (*Id.* at 311, 315.) Nonetheless, Dr. Cohen noted neither condition resulted in functional limitations to Pringle's daily life, social activities, or ability to concentrate. (*Id.* at 318.)

### 8. Dr. Karen Owen (5/18/04)

Pringle sought mental health care from Dr. Owen beginning May 18, 2004. (*Id.* at 376.) Dr. Owen noted Pringle's depressed mood and recommended coping mechanisms. (*Id.* at 366.) After four visits, Pringle stopped all therapy with Dr. Owen. (*Id.* at 359.)

### 9. Dr. John Spencer, M.D. (2/23/05-5/4/05)

Pringle began seeing Dr. Spencer as her primary physician on May 4, 2004 after leaving Dr. Hunt's care. (*Id.* at 358.) During the first office visit, Dr. Spencer noted the prior diagnoses of fibromyalgia, GERD, and irritable bowel syndrome. (*Id.*) He recorded worsening pain, which concentrated in her knee, and resulted in reduced physical activity and weight gain. He described the crepitation in her knees as "rather

7

severe." (Id.) To address her body and joint pain, Dr. Spencer prescribed Celebrex. (Id.) On May 19, 2004, two weeks after her first appointment, Dr. Spencer ordered a permanent disabled parking placard because of her arthritic, neurological, or orthopedic condition, and submitted a form to the Department of Social and Rehabilitation Services in Kansas. (Id. at 152, 384.) Therein, he reported Pringle's depression, fibromyalgia, and GERD, as beginning in November 2002 and would last her lifetime, affecting her ability to participate in training and employment. (Id. at 384) He explained her difficulties in concentrating, standing, and sitting limited her work opportunities. (Id.)

Approximately six weeks later, Dr. Spencer examined Pringle again and noted Celebrex caused stomach upset, which prevented any improvement in joint pain. (Id. at 357.) On August 4, 2004, Pringle complained of lower back pain resulting from a fall. (Id. at 356.) She was previously seen in the emergency room, and prescribed Hydrocodone and Flexeril for the injury. (Id.) Dr. Spencer prescribed Vioxx and Skelaxin with instructions to continue with the Hydrocodone. (Id.) One week later, Dr. Spencer again examined Pringle's lower back for complaints of persistent pain and observed limited range of motion and tenderness. (Id. at 355.) In addition to the pain medications previously prescribed, Dr. Spencer recommended physical therapy three times per week. (Id.)

After a week of physical therapy, Pringle returned to Dr. Spencer reporting little change. (Id. at 354.) He injected the sacroiliac region, which showed significant tenderness with Depo-Medrol, and instructed her to continue with the pain medications. (Id.) Dr. Spencer noted Pringle's difficulty in obtaining medications because of Medicaid authorization delays. (Id. at 353.) Approximately one month later, Pringle

8

returned complaining of back problems, after another fall about three weeks earlier. (Id. at 352.) While Dr. Spencer noted she was "doing okay," he continued prescribing Hydrocodone. (Id.) During her next appointment two months later, Dr. Spencer recorded "she is feeling a little better," but is "still having a lot of pain" and continued with the Hydrocodone. (Id. at 351.) After four months without improvement, Dr. Spencer ordered an MRI of the lumbosacral area. (Id. at 350.) The MRI, taken on December 2, 2004, evidenced some disc desiccation and a possible annular tear at L5-S1, without any bulge, protrusion, or extrusion. (Id. at 343.) After the MRI, Pringle visited Dr. Saba from Fort Scott Orthopedic Services for her results and a physical evaluation on December 10, 2004. (D.I. 15 at 663.) Dr. Saba reported Pringle had attended physical therapy eleven times and received a cortisone shot without improvement. (Id.) Dr. Saba observed limited range of motion and facial expressions revealing severe pain on motion. (Id.) Although he noted her symptoms suggested herniation nucleolus pulposus ("HNP"), Dr. Saba concluded evidence of HNP was lacking, and further commented "there were many signs suggesting symptoms magnifications." (Id.) He attributed the back pain to a possible disk injury to the L 4/5 or L 5/S1, which did not warrant surgical intervention. (Id.) No follow up appointment was scheduled, however Dr. Saba referred Pringle to a pain clinic. (Id.)

Pringle first visited the pain clinic on December 20, 2004, where Dr. Landers administered a steroid epidural injection. (Id. at 681.) He reported straight leg motion of seventy degrees and standing for approximately thirty minutes aggravated her back pain. (Id.) Without noting any change in symptoms, Dr. Landers administered another steroid epidural injection on December 27, 2004, and Dr. Pau, of the same pain clinic,

administered a caudal epidural on January 6, 2005. (Id. at 674, 677.) In letters to Drs. Saba and Spencer, Dr. Pau reported no pain relief from the three injections, and since Pringle was not a surgical candidate, recommended pain management using Neurontin. (Id. at 666, 669.)

While attending the pain clinic, during an office visit, Dr. Spencer noted Pringle was doing well, but acknowledged she remained on pain medications, and a cortisone injection failed to alleviate her back pain. (D.I. 10 at 348.) On February 2, 2005, Dr. Spencer increased the Neurontin dosage. (Id. at 347.) On February 23, 2005, Dr. Spencer submitted a Medical Source Statement to ALJ Stanley noting the following: Pringle could frequently lift and/or carry less than five pounds, occasionally lift and/or carry five pounds, continuously stand and/or walk thirty minutes, stand and/or walk two hours throughout an eight hour workday, sit continuously for thirty minutes, and sit for two hours throughout an eight hour workday, but must lie down for thirty minutes every two or three hours to alleviate pain. (Id. at 381-82.) He reported Pringle could never balance, crouch, or crawl, and could occasionally climb, stoop, kneel, reach, and handle, and had difficulty concentrating while on Zoloft. (Id. at 382.)

On February 23, 2005, Dr. Spencer again increased the Neurontin dosage for back and leg pain. (D.I. 15 at 725.) On May 4, 2005, Dr. Spencer noted significant pain, although the Neurontin and Flexeril "seem[ed] to be helping some." (Id. at 724.) Pringle returned to Dr. Spencer on September 14, 2005 complaining of burning in her feet that worsens while standing. (Id. at 722.)

10

## 10. Unsigned and Undated RFC Assessment

Another RFC assessment was conducted after Pringle requested
reconsideration of the denial of DIB and SSI benefits. (D.I. 10 at 323.) Although the
assessment reduces the weight she could occasionally lift to twenty pounds and
frequently lift to ten pounds, it contains no other changes. (Id.) The examiner also
noted Dr. Spencer's request for a disabled parking placard based on depression,
fibromyalgia, and GERD. (Id. at 324.) The examiner emphasized the lack of medical
evidence supporting a diagnosis of fibromyalgia, and no new evidence demonstrated
"any significant limitations" in Pringle's ability to "perform her day-to-day activities." (Id.)

## 11. Consultative Psychological Examination (12/28/05)

Dr. Todd Schemmel performed a consultative psychological examination on
December 28, 2005. (D.I. 15 at 685.) He reported poor attention span and
concentration, adequate short-term memory, and below average long-term memory.
(Id. at 686.) He found Pringle "demonstrated her depression through a depressed
mood, slow thought processes, feelings of loss and sadness over the death of her
mother two years ago, low energy, tearfulness, and poor concentration." (Id.) Dr.
Schemmel suggested Pringle was "unlikely to encounter significant interference from
her depressive symptoms" if she returned to work. (Id.)

## 12. Dr. Jeffrey T. MacMillan (4/3/06)

At some point during 2006, Pringle sought treatment from Dr. Jeffrey MacMillan.
(D.I. 15 at 741.) During a visit on March 6, 2006, Pringle explained she had almost
intolerable "progressively worsening low back pain." (Id. at 739.) Dr. MacMillan
prescribed Methadone for pain and ordered a lumbar spine diskogram, which revealed

11

mildly irregular disc margins at the L3-4 level without evidence of an annular tear, an annular tear at the L4-5 level, and a small disc bulge at the L5-S1 level. (Id. at 739-40.)

### 13.    Dr. Franklin Ampadu (3/29/07)

On March 29, 2007, after Pringle moved to Delaware, she was evaluated by Dr. Ampadu. (D.I. 15 at 765.) He summarized her previous diagnoses and recorded her statement that despite complaints about persistent lower back pain, doctors could find no severe problem. (Id.) While under Dr. Ampadu's care, Pringle suffered a nervous breakdown and was treated for depressive disorder. (Id. at 761.) Dr. Ampadu submitted a form to Delaware Health and Social Services, reporting Pringle could not work in her usual occupation nor on a full-time basis. (Id.)

### 14.    Dr. Brian Simon (Psychological Evaluation 9/11/07)

Dr. Brian Simon conducted a psychological evaluation on September 11, 2007. (Id. at 766.) Pringle advised she was applying for disability benefits because of depression. (Id.) He listed her previously prescribed medications, including Atrovent, Albuterol, Prednisone, Guaifensin, Zoloft, Tramadol, Tiamcinalone/HCTZ, Triampterine, Gabapentin, Nexium, Acetaminophen, Flexeril, Naproxen, Hydrocodone, and Vicodin, and noted previous diagnoses of asthma, fibromyalgia, arthritis, peripheral neuropathy, and depression. (Id. at 767.) Her medications at that time included Methylprednisolone, Singulair, Triamterene, Naproxen, Sertraline, Loratadine, Labetalol, Cyclobenzaprine, Hydrocodone, Lunesta, Hyoscamine, Prevacid, Gabapentin, and Tileptal. (Id.) Pringle related she had two ruptured discs and a pinched nerve in her back. (Id. at 766.) She complained the prescribed medications cause dry mouth, shakiness, forgetfulness, and blurred vision. (Id. at 767.) Dr. Simon

12

observed Pringle's attention and concentration as fair and her speech normal. (*Id.*) He noted she appeared to be nervous and shaky at times. (*Id.*) Pringle reported auditory hallucinations of her mother since the time of her death. (*Id.*) Dr. Simon concluded Pringle's "judgment and insight into her illness . . . to be poor," and she "very likely overstated [her] problems." (*Id.* at 767, 770.) Regarding employment, Dr. Simon opined "it seems probably that she has encountered some significant problems being able to work because of her psychiatric and medical problems," and was concerned about her ability to handle stressful situations and relate to others in a working environment. (*Id.* at 771.) On the Delaware Psychological Functional Capacities Evaluation Form, Dr. Simon rated Pringle's ability to relate to other people as moderate, her restriction of daily activities as moderately severe, her deterioration of personal habits moderate, and her constriction of interests as moderately severe. (*Id.* at 772.) Within the employment setting, Dr. Simon rated her ability to understand simple instructions as mild, to carry out instructions under ordinary supervision as moderately severe, to sustain work performance and attendance as moderately severe, to cope with pressures of ordinary work as severe, and to perform routine tasks as moderately severe. (*Id.* at 773.)

## B. Hearing Testimony

### 1. Sharon Pringle's Testimony

During ALJ Banas' first hearing on July 19, 2007, Pringle testified she lived with her son, his wife and grandchild in a multi-level home, with her bedroom on the main floor. (*Id.* at 788.) Regarding household chores, Pringle folds laundry while seated. (*Id.*) Although she has a driver's license, Pringle claimed to neither own nor drive a car.

13

(Id. at 789.) She has not been employed since November 2002, and did not believe she could return to her previous jobs. (Id. at 789-90.) Pringle claimed sitting was limited and she continually shakes. (Id. at 790.) She testified her depression worsened despite the medication Zoloft, and she usually stays in bed or at home. (Id. at 790-91.) She was uncomfortable around people, and was unable to handle any stress. (Id. at 795-96.)

When questioned by ALJ Banas about other health problems, Pringle testified her asthma was well-managed by medication, but she avoided pollen, dust, and fumes. (Id. at 791.) She has body pain from the neck down, with the severity varying daily. (Id. at 791-92.) Pringle claimed a diagnosis of fibromyalgia, but no treatment for this condition was prescribed. (Id. at 792.) Although she claimed extremely elevated blood pressure, during an recent emergency room admission, her hypertension was generally controlled. (Id. at 792-93.) Pringle testified her stomach swells after eating, requiring her to sit and remove her pants for relief. (Id. at 793.) She could only stand for thirty minutes and sitting was uncomfortable. (Id. at 794.) Pringle also testified she had a pinched nerve in her back, which affected both legs and caused her to recently fall. (Id.)

Regarding her daily activities, she has difficulty sleeping, causing her to nod off during the day. (Id. at 797.) She is unable to do the things she used to, and typically lays in bed or on the sofa. (Id.) She does not attend social events or religious meetings. (Id.)

During the second hearing on April 8, 2008, Pringle testified she was only technically employed in 2003 when she cared for her ailing mother. (Id. at 812.)

14

Pringle explained she did not feed or dress her mother because her mother could perform such tasks. (*Id.* at 814.) Rather, Pringle explained she usually kept her mother company. (*Id.*)

Pringle claimed to suffer from asthma, depression, and digestive problems since 2002. (*Id.*) She related a hospitalization for digestive problems before she began caring for her mother. (*Id.* at 816.) After her mother's death, Pringle lived with her father, helping him by answering the phone. (*Id.* at 819.) Her boyfriend and children handle the household chores. (*Id.* at 820.) She has not lived alone since 2004. (*Id.* at 821.) Pringle claimed she could only walk for about half an hour and could not lift over five pounds. (*Id.* at 816-17.) Regarding her mental state, Pringle related significant depression, especially since her mother's death in 2004 and father's passing in 2007. (*Id.* at 817-18.)

### 2. Dawn Barresi's Testimony

During ALJ Banas's first hearing in July 2007, Barresi testified she has known Pringle for approximately a year and a half and accompanied her to doctors' appointments. (*Id.* at 799.) She claimed to drive Pringle everywhere. (*Id.*) Barresi did not offer any significant testimony during the second hearing on April 8, 2008 because she initially met Pringle in November 2005, and the period at issue involved the 2002-2005 time frame. (*Id.* at 823.)

### 3. Vocational Expert's Testimony

A vocational expert, Howard-Reed, testified during the first hearing on July 19, 2007. (*Id.* at 801.) After acknowledging Pringle's previous employment as a nurse's aid, general manager at Pizza Hut, and shift manager, the VE opined Pringle's

15

managerial and clerical skills were transferable to sedentary jobs. (*Id.*) In response to ALJ Banas hypothetical of an individual having the same physical and emotional ailments as Pringle, the VE explained an individual with the same limitations and similar work history was not capable of employment. (*Id.* at 802.) ALJ Banas then altered his hypothetical, stating the individual might be capable of performing simple and routine sedentary work, with no exposure to dust or fumes, and required occasional changes in position for postural comfort. (*Id.* at 803) In response, VE Howard-Reed posited that individual was capable of employment, citing a sedentary security guard, an assembler, and an order clerk as possible positions. (*Id.*)

Christina Beatty-Cody, another vocational expert, testified during the second hearing on April 8, 2008. (*Id.* at 825.) After the VE reviewed Pringle's work history, ALJ Banas inquired about the vocational impact depression and pain might have on an individual's ability to perform similar jobs. (*Id.* at 827.) The VE advised a fifteen to twenty percent reduction in productivity due to depression and pain, which would be work preclusive. (*Id.* at 828.) ALJ Banas propounded a hypothetical individual with a work history similar to Pringle's and a capacity for light level exertion, limited to simple jobs that allowed occasional postural changes for pain relief, and did not entail exposure to excessive pulmonary irritants. (*Id.*) The VE concluded an individual with such limitations could obtain employment, including positions as a collator, photocopy machine operator, or mail room clerk. (*Id.* at 829.)

## C. The ALJ's Findings

The Social Security Administration uses a five-step sequential claim evaluation process to determine whether an individual is disabled:

16

[The Commissioner] determines first whether an individual is currently engaged in substantial gainful activity. If that individual is engaged in substantial gainful activity, he will be found not disabled regardless of the medical findings. 20 C.F.R. § 404.1520(b). If an individual is found not to be engaged in substantial gainful activity, the [Commissioner] will determine whether the medical evidence indicates that the claimant suffers from a severe impairment. 20 C.F.R. § 404.1520(c). If the [Commissioner] determines that the claimant suffers from a severe impairment, the [Commissioner] will next determine whether the impairment meets or equals a list of impairments in Appendix I of sub-part P of Regulations No. 4 of the Code of Regulations. 20 C.F.R. § 404.1520(d). If the individual meets or equals the list of impairments, the claimant will be found disabled. If he does not, the [Commissioner] must determine if the individual was capable of performing in his past relevant work considering his severe impairment. 20 C.F.R. § 404.1520(e). If the [Commissioner] determines that the individual is not capable of performing his past relevant work, then he must determine whether, considering the claimant's age, education, past work experience and residual functional capacity, he is capable of performing other work which exists in the national economy. 20 C.F.R. § 404.1520(f).

*West v. Astrue*, C.A. No. 07-158, 2009 WL 2611224, at *5 (D. Del. August 26, 2009)

(quoting *Brewster v. Heckler*, 786 F.2d 581, 583-84 (3d Cir. 1986)). Based on the

factual evidence and the testimony of Pringle, Barresi, and the VE, ALJ Banas

determined Pringle was not disabled prior to May 17, 2007 and, therefore, was not

eligible for DIB or SSI. (D.I. 10 at 403.) His findings on January 8, 2008 are

summarized as follows:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2008. (D.I. 15 at 476.)

2. The claimant has not engaged in substantial gainful activity since July 19, 2005, the alleged onset date (20 C.F.R. § 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.). (*Id.*)

3. Since the alleged onset date of disability, the claimant has had the following severe impairments: Fibromyalgia, asthma, hypertension, degenerative disc disease, depression, somatization disorder, and personality disorder (20 C.F.R. § 404.1520(c) and 406.920(c)). (*Id.* at 477.)

17

4. Since the alleged onset date of disability, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Supart P, Appendix 1 (20 C.F.R. § 404.1520(d) and 416.920(d)). (*Id.*)

5. After careful consideration of the entire record, the undersigned finds that, prior to May 17, 2007, the claimant had the residual functional capacity to perform light work as defined in the Dictionary of Occupational Titles, except that the claimant was limited to low stress jobs, defined as only occasional decision-making, with a sit/stand option, no concentrated exposure to pulmonary irritants, and jobs which were simple and routine in nature. (*Id.* at 478-79.)

6. After careful consideration of the entire record, the undersigned finds that, beginning on May 17, 2007, the claimant has had the residual functional capacity to perform sedentary work as defined in the Dictionary of Occupational Titles, except that she is limited to jobs with a sit/stand option, no concentrated exposure to pulmonary irritants, jobs which are simple and routine in nature, and jobs which involve no stress at all. (*Id.* at 482.)

7. Prior to May 17, 2007, the claimant was capable of performing past relevant work (20 C.F.R. § 404.1565 and 416.965). (*Id.* at 484.)

8. Beginning on May 17, 2007, the claimant's residual functional capacity has prevented the claimant from being able to perform past relevant work (20 C.F.R. § 404.1565 and 416.965). (*Id.*)

9. The claimant was born on July 15, 1962, and was 44 years old, which is defined as a younger individual age 18-44, on May 17, 2007, the established disability onset date. As of July 15, 2007, the claimant is a younger individual age 45-49 (20 C.F.R. § 404.1563 and 416.963). (*Id.*)

10. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564 and 416.964). (*Id.*)

11. The claimant has not acquired work skills that are transferable to other occupations within the residual functional capacity determined for the period beginning on May 17, 2007 (20 C.F.R. § 404.1568 and 416.968). (*Id.* at 485.)

12. Beginning on May 17, 2007, considering the claimant's age, education, work experience, and residual functional capacity, there

18

are not a significant number of jobs in the national economy that the claimant could perform (20 C.F.R. §404.1560©, 404.1566, 416.960(c), and 416.966). (*Id.*)

13.     The claimant was not disabled prior to May 17, 2007 (20 C.F.R. § 404.1520(f) and 416.920(f)), but became disabled on that date and has continued to be disabled through the date of this decision (20 C.F.R. § 404.1520(g) and 416.920(g)). (*Id.*)

The ALJ's subsequent findings on April 18, 2008, incorporating the above findings, are

summarized as follows:

1.     The claimant meets the insured status requirements of the Social Security Act through September 30, 2008. (D.I. 10 at 392.)

2.     The claimant has not engaged in substantial gainful activity since November 3, 2002, the alleged onset date (20 C.F.R. § 404.1520(b), 404.1571 et seq., 416.920(b), and 416.971 et seq.). (*Id.*)

3.     Since the alleged onset date of disability, the claimant has had the following severe impairments: Depression, asthma, fibromyalgia, gastrointestinal problems, degenerative disc disease, and obesity (20 C.F.R. § 404.1520(c) and 416.920(c)). (*Id.* at 393.)

4.     Since the alleged onset date of disability, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1520(d) and 416.920(d)). (*Id.* at 394.)

5.     After careful consideration of the entire record, the undersigned finds that, prior to May 17, 2007, the date the claimant became disabled, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) except that this work must have been simple and routine in nature due to moderate concentration deficits, would have to provide the option to occasionally change positions for relief of postural discomfort, and would not entail excessive exposure to pulmonary irritants due to the claimant's history of asthma. (*Id.* at 395.)

6.     After careful consideration of the entire record, the undersigned finds that, beginning on May 17, 2007, the claimant has had the residual functional capacity to perform sedentary work as defined in

19

20 C.F.R. § 404.1567(a) and 416.9679a) except that she is limited
to jobs with a sit/stand option, no concentrated exposure to
pulmonary irritants, jobs which are simple and routine in nature,
and jobs which involve no stress at all. (*Id.* at 400.)

7.    Since the alleged onset date of disability, the claimant has been
      unable to perform past relevant work (20 C.F.R. § 404.1565 and
      416.965). (*Id.* at 401.)

8.    The claimant was born on July 15, 1962 and was 40 years old,
      which is defined as a younger individual age 18-49, on the alleged
      disability onset date (20 C.F.R. § 404.1563 and 416.963). (*Id.*)

9.    The claimant has at least a high school education and is able to
      communicate in English (20 C.F.R. § 404.1564 and 416.964). (*Id.*)

10.   Prior to May 17, 2007, transferability of job skills is not material to
      the determination of disability because using the Medical-
      Vocational Rules as a framework supports a finding that the
      claimant is "not disabled," whether or not the claimant has
      transferable job skills. Beginning on May 17, 2007, the claimant
      has not been able to transfer any job skills to other occupations
      (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).
      (*Id.*)

11.   Prior to May 17, 2007, considering the claimant's age, education,
      work experience, and residual functional capacity, there were a
      significant number of jobs in the national economy that the claimant
      could have performed (20 C.F.R. § 404.1560(c), 404.1566,
      416.960(c), and 416.966). (*Id.*)

12.   Beginning on May 17, 2007, considering the claimant's age,
      education, work experience, and residual functional capacity, there
      are not a significant number of jobs in the national economy that
      the claimant could perform (20 C.F.R. § 404.1560(c), 404.1566,
      419.960(c), and 416.966). (*Id.* at 402.)

13.   The claimant was not disabled prior to May 17, 2007, but became
      disabled on that date and has continued to be disabled through the
      date of this decision (20 C.F.R. § 404.1520(g) and 416.920(g)).
      (*Id.* at 403.)

20

## III.   STANDARD OF REVIEW

### A.   Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of

Civil Procedure 56(c). In determining the appropriateness of summary judgment, the

court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor

of the non-moving party[,]' but [refraining from] weighing the evidence or making

credibility determinations." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

150 (2000) (citation omitted). If the court determines that there is no genuine issue as

to any material fact and that the movant is entitled to judgment as a matter of law,

summary judgment is appropriate. *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d

Cir. 2005) (quoting FED. R. CIV. P. 56(c)).

### B.   Review of the ALJ's Findings

The court must uphold the Commissioner's factual decisions if they are

supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial

evidence does not mean a large or a considerable amount of evidence. *Pierce v.*

*Underwood*, 487 U.S. 552, 565 (1988) (citing *Consol. Edison Co. v. NLRB*, 305 U.S.

197, 229 (1938)). Rather, it has been defined as "more than a mere scintilla. It means

such relevant evidence as a reasonable mind might accept as adequate." *Ventura v.*

*Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389,

401 (1971)).

Credibility determinations are the province of the ALJ, and should be disturbed

on review only if they are not supported by substantial evidence. *Pysher v. Apfel*, Civ.

A. No. 00-1309, 2001 WL 793305, at *2 (E.D. Pa. July 11, 2001) (citing *Van Horn v.*

21

*Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)). Thus, the inquiry is not whether the court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). In social security cases, this substantial evidence standard applies to motions for summary judgment brought pursuant to FED. R. CIV. P. 56(c). *Woody v. Sec'y of the Dep't of Health & Human Serv.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

## IV.    DISCUSSION

After considering the record in this case, the parties' submissions and arguments, and the applicable law, the court concludes that the ALJ's decision is not supported by substantial evidence. Specifically, the court finds that the ALJ erred in failing to properly weigh the opinions of Pringle's treating physician, and in failing to account for all disabling conditions in his hypothetical question to the vocational expert. The court will remand to correct the deficiencies and determine Pringle's disability status for the additional claimed period of disability before May 17, 2007.

### A.    Treating Physician's Medical Opinion

An examining doctor's written report setting forth medical findings in the doctor's area of competence "may constitute substantial evidence." *Richardson*, 402 U.S. at 402. In determining the proper weight to give to such medical opinions, an ALJ is required to weigh all evidence and resolve any material conflicts. *See id.* at 399. Regarding such weight, the Third Circuit stated that "treating physicians' reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826

22

F.2d 348, 350 (3d Cir. 1987)). A treating physician's opinion is "entitled to substantial and at times even controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)).

An ALJ, however, may reject a treating physician's opinion if it is based on "contradictory medical evidence." *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) (citation omitted). In those instances, "[e]ven where there is contradictory medical evidence, . . . and an ALJ decides not to give a treating physician's opinion controlling weight, the ALJ must still carefully evaluate how much weight to give the treating physician's opinion." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 660 (D. Del. 2008). Further, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927." Social Security Regulation ("S.S.R.") 96-2p, 1996 WL 374188, at *4 (July 2, 1996).

It is improper for an ALJ to disregard a treating physician's medical opinion based solely on one's own impression of the record and evaluation of a claimant's credibility. *See Morales*, 225 F.3d at 318 ("The ALJ cannot . . . disregard [a treating physician's] medical opinion based solely on his own 'amorphous impressions, gleaned from the record and from his evaluation of [the claimant]'s credibility.'") (citation omitted). Additionally, some explanation must be given "for a rejection of probative evidence which would suggest a contrary disposition." *Brewster*, 786 F.2d at 585. It can be appropriate to accept some evidence and reject the rest; however, all evidence must be considered and a reason for rejection must be provided. *See Stewart v. Sec'y of H.E.W.*, 714 F.2d 287, 290 (3d Cir. 1983).

23

Here, the court finds the weight apportioned by the ALJ to Pringle's treating physician's reports is not based on substantial evidence in the record. During the time period at issue, Dr. Spencer primarily treated Pringle and Drs. Fortune and Mintz performed Pringle's consultative physical and psychological examinations, respectively. In his opinion, the ALJ explained he could not give Dr. Spencer's opinion either "controlling" or "significant weight," but failed to specify how much weight, if any, Dr. Spencer's opinion received. (D.I. 10 at 400.)

In weighing the medical opinions, the ALJ accurately explained that treating source opinions may be entitled to controlling weight if the opinion is well-supported and not inconsistent with the other substantial evidence on the record. (*Id.* at 399.) Moreover, the ALJ explained even if the treating source opinion is not entitled to controlling weight, the opinion must be evaluated using factors including: the length of the examining relationship, the treatment relationship, supportability with the relevant medical evidence, consistency with the record as a whole, the source's specialization, and any other factors which tend to support or contradict the opinion. (*Id.* at 399-400.)

The ALJ stated he could not give Dr. Spencer's opinion controlling weight because (1) the opinion is inconsistent with the other substantial evidence of record and (2) the opinion is not supported by the relevant medical evidence. (*Id.* at 400.) In making this determination regarding Pringle's physical condition, the ALJ exclusively compared Dr. Spencer's opinion with that of Dr. Fortune, who conducted a physical examination on December 11, 2003. (*Id.* at 397.) In his determination regarding Pringle's psychological condition, the ALJ focused on Dr. Mintz's consultative psychological examination on April 23, 2004. (*Id.* at 303.)

First, although Dr. Fortune's examination does contradict Dr. Spencer's opinion relating to Pringle's physical limitations, Dr. Fortune's examination was rendered on December 11, 2003, long before the record was complete and seven months before Pringle fell and injured her back. (*Id.*) Such contradictory evidence that predates the claimant's principal complaint, cannot outweigh a treating physician's opinion. *See Dougherty v. Astrue*, 715 F. Supp. 2d 572, 583 (D. Del. 2010). Morever, Dr. Mintz's psychological evaluation does not contradict Dr. Spencer's opinion because Dr. Spencer did not diagnose Pringle's depression; Dr. Spencer noted Pringle's history of depression and continued prescribing her Zoloft based on that previous diagnosis. (D.I. 10 at 382, 384.)

Second, the ALJ deemed Dr. Spencer's opinion inconsistent with the other medical evidence on the record, such as Pringle's "benign MRI findings showing only the possibility of a small annular disc bulge," and his notes that Pringle was "feeling a little better" or "doing okay." (*Id.* at 396, 400.) The Third Circuit, however, has cautioned "a doctor's observation that a patient is 'stable and well controlled with medication' during treatment does not [necessarily] support the medical conclusion that [the patient] can return to work." *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 356 (3d Cir. 2008). Thus, contrary to the ALJ's assertions, Dr. Spencer's opinion is not internally inconsistent. (D.I. 10 at 400.)

In addition, the record supports Dr. Spencer's opinion. Dr. Spencer's treatment notes for his one-year treating relationship with Pringle indicate she suffered from a number of physical impairments, including, among other things, joint pain, body pain, GERD, crepitation in her knees, and back pain. (*Id.* at 358.) Moreover, although the MRI showed no evidence of disc bulging, protrusion, or extrusion, the MRI did show

disc desiccation and a possible annular tear. (*Id.* at 343.) It is evident from Dr. Spencer's record that, due to the severity of her condition, Pringle required the full battery of treatment options, including physical therapy, injections, medications, and referrals to specialists. (*Id.* at 347-51.) Despite such treatment, Dr. Spencer noted a lack of improvement, continued prescribing Hydrocodone, and increased the dosage of Neurontin. (*Id.* at 347.)

Third, the ALJ emphasized Pringle's reported daily activities are "inconsistent with her complaints of severe and unrelenting pain." (*Id.* at 399.) Specifically, the ALJ emphasized she "was able to take care of her personal needs, prepare simple meals and do laundry with assistance, perform household chores, shop for groceries, and drive locally." (*Id.*) At the first hearing, Pringle testified, however, she could only fold laundry while seated, could not drive, became uncomfortable around groups of people, nodded off during the day due to lack of sleep, and usually laid in bed or on the sofa throughout the day. (D.I. 15 at 797.) Barresi testified she drove Pringle everywhere. (*Id.* at 799.) At the second hearing, Pringle testified her boyfriend and children handled the household chores and she had not lived alone since 2004. (*Id.* at 820-21.) For these reasons, the court is not convinced the ALJ accurately characterized Pringle's activities of daily living when he cited such as the partial basis for rejecting Dr. Spencer's opinion. The court recognizes the ALJ was entitled to, and did, determine Pringle's testimony concerning the intensity, persistance, and limiting effects of her symptoms was not entirely credible. (D.I. 10 at 398-99.) The court is also cognizant of its obligation to avoid second-guessing such credibility judgments. The court notes, however, that it is improper for an ALJ to disregard a treating physician's medical opinion based solely on his own impression of the record and his evaluation of a

claimant's credibility. See Morales, 225 F.3d at 318 ("The ALJ cannot, as he did here, disregard [a treating physician's] medical opinion based solely on his own amorphous impressions, gleaned from the record and from his evaluation of [the claimant]'s credibility.").

The court finds that the ALJ so erred in this case. For the reasons above, the court finds the ALJ failed to accord proper weight to the medical opinion and assessment of Pringle's treating physician and, therefore, concludes the ALJ's decision is not supported by substantial evidence in the record.

## B. Vocational Expert Testimony of Available Work

Pringle next asserts the ALJ erred by failing to include all her limitations in his hypothetical. Hypothetical questions asked to a VE need only reflect the impairments supported by the record. See McDonald v. Astrue, No. 07-4493, 2008 WL 4368226, at *3 (3d Cir. 2008). Consequently, when a hypothetical is accurate, a VE's response constitutes substantial evidence. See id. (citing Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987)). Therefore, a VE's testimony is only valid if based on a hypothetical question that accurately reflects a claimant's physical and mental limitations. See Myers v. Comm'r of Soc. Sec., No. 08-2906, 2009 WL 2445129, at *1 (3d Cir. 2009) (citing Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984)). When a hypothetical question is deficient, remand is required. Alley v. Astrue, 862 F. Supp. 2d 352, 365 (D. Del. 2012). The Third Circuit has provided guidance regarding whether an impairment must be included in the hypothetical:

Limitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response. [Second], and [r]elatedly, the ALJ may not substitute his or her own expertise to refute such record evidence. Limitations that are medically supported but are

27

also contradicted by other evidence in the record may or may not be
found credible-the ALJ can choose to credit portions of the existing
evidence but cannot reject evidence for no reason or for the wrong
reason. Finally, limitations that are asserted by the claimant but that lack
objective medical support may possibly be considered nonetheless
credible. In that respect the ALJ can reject such a limitation if there is
conflicting evidence in the record, but should not reject a claimed
symptom that is related to an impairment and is consistent with the
medical record simply because there is no objective medical evidence to
support it.

*Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).

Here, Pringle claims the hypothetical failed to account for limitations identified by

her treating physicians as well as limitations accepted by the ALJ. (D.I. 22 at 10.)

Specifically, she claims the hypothetical should have included difficulties with social

functioning due to depression and a low stress limitation. (*Id.*) In response, the

Commissioner argues the limitations left out of the hypothetical were not supported by

the record, and therefore were not required to be included in the hypothetical. (D.I. 27

at 14.)

At the ALJ's first hearing on July 19, 2007, he posed the following hypothetical to

the VE:

Now, going to a hypothetical individual, what if we have a hypothetical
individual, a younger individual with a high school education and a prior
work history similar to that of the Claimant, and what if this hypothetical
individual has all the symptoms and limitations that the Claimant stated
here today during the hearing that she has, would such a hypothetical
individual be capable of any jobs?

(D.I. 15 at 802.) The VE responded the hypothetical individual would not be capable of

any jobs because of her physical limitations and emotional problems. (*Id.*) The ALJ

then posed a second hypothetical, stating the hypothetical individual "might be capable

of performing work activity at a sedentary level of exertion." (*Id.* at 803.) In response,

the VE concluded the hypothetical individual would be capable of performing certain

sedentary jobs, such as a sedentary security guard. (Id.) At the ALJ's second hearing on April 8, 2008, he provided a different hypothetical:

> So if we have a hypothetical individual who's a younger individual with a high school education and prior work history similar to that of the claimant and if this hypothetical individual suffers from a combination of physical and mental problems so that she is limited to less than a full range and has pain and depression that reduce her productivity to maybe about 25, there's a 25 percent reduction in her ability to sustain and maintain work, would that be work preclusive?

(Id. at 828.) The VE responded this hypothetical individual would be precluded from work. (Id.) The ALJ then altered his hypothetical, specifying the individual "might be capable of performing work activity at a light level of exertion" with a few limitations: the jobs had to be "simple" and "routine in nature," "provide an option to occasionally change positions for relief of postural discomfort," and "not entail exposure to excessive pulmonary irritants." (Id.) The VE stated this hypothetical individual could perform employment such as a collator. (Id. at 829.) Based on these hypotheticals, the ALJ concluded Pringle could perform light work, as defined in 20 C.F.R. § 404.1567(b), before May 17, 2007, and only sedentary work, as defined in 20 C.F.R. § 404.1567(a), beginning on May 17, 2007. (D.I. 10 at 395, 400.)

The ALJ, however, noted Pringle had been diagnosed and treated for depressive disorder prior to 2007, both by her treating physicians and the state consultative mental examiner, Dr. Mintz. (Id. at 393, 396.) Following these diagnoses, Pringle sought treatment for depression from Dr. Karen Owen beginning on May 18, 2004. (Id. at 376.) Pringle was also admitted to the emergency room at Christiana Care a few days prior to the first hearing, where she was treated for depressive disorder and was told she was having a nervous breakdown. (Id. at 523-24.)

Based on these facts, the ALJ could not exclude "uncontroverted" and "medically supported" limitations from the hypothetical. See Rutherford, 399 F.3d at 554. Even if treating physicians and state examiners differed as to the degree of Pringle's depression, there exist no medical opinions on the record that deny she suffers from some kind of depressive disorder; thus, the ALJ could not rely on conflicting evidence in the record to justify excluding a depressive disorder from the hypothetical. See id. Because the ALJ based his findings regarding Pringle's working capacity on a deficient hypothetical, the court finds it was not based on substantial evidence. See Chrupcala, 829 F.2d at 1276. Thus, remand is required. Alley, 862 F. Supp. 2d at 365.

## C. Disability Onset Date

The onset date of disability is determined from the medical records and reports and other similar evidence, which requires the ALJ to apply informed judgment. SSR 83–20. The ALJ should consider factors including the claimant's allegations, work history, and the medical evidence in the record when making this determination. Id. The onset date is defined as "the first day an individual is disabled as defined in the Act and the regulations." Id. For the same reasons as set forth above regarding the ALJ's weighing of the medical evidence and limitations included within the VE's hypothetical, the court finds the ALJ's determination of the disability onset date to be in error.

Pringle relies on a series of cases to support the proposition that the ALJ should have used medical expert testimony to establish the onset date. (D.I. 22 at 14.) However, this reliance is misplaced because these cases refer only to slow progressive impairments wherein the onset date must be inferred. Allen v. Barnhart, 471 F.3d 396, 403 (3d Cir. 2005); Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 548 (3d Cir. 2003);

*Walton v. Halter*, 243 F.3d 703, 708-09 (3d Cir. 2001). Here, Pringle does not suffer from a slow progressive impairment and the onset date does not need to be inferred because the record contains medical opinions dating back to 2002.

Alternatively, the Commissioner argues the ALJ's onset date is supported by substantial evidence. (D.I. 27 at 18.) The Commissioner asserts "a combination of Dr. Simon's psychological evaluation of Plaintiff and Dr. Ampadu's disability certification provide a medical basis." (*Id.*) After these diagnostic findings, the ALJ determined Pringle could not handle any stress at work, compared with the light stress he deemed her capable of handling before such findings. (*Id.*)

Although the ALJ is entitled to use his informed judgment based on the claimant's alleged onset date, the claimant's work history, and the medical evidence in the record, the above findings that the ALJ improperly weighed the medical evidence and failed to include the appropriate impairments within the VE's hypothetical necessitate a finding that the onset date was mistakenly calculated because the ALJ based the onset date on weighing the medical evidence and the VE's response to his hypotheticals.

### D.    Integrity of the Record

Finally, Pringle claims the record before the court lacks the requisite integrity to allow proper judicial review. (D.I. 22 at 5.) The ALJ must sufficiently establish the record to allow the court to properly review his findings. *Cotter v. Harris*, 642 F.2d 700, 705-06 (3d Cir. 1981). Further, the ALJ's decision should be "accompanied by a clear and satisfactory explication of the basis on which it rests." *Id.* at 704.

Here, the Commissioner moved to remand the case to the Social Security Administration after failing to produce an administrative record to the court. (D.I. 4.)

31

The Commissioner then moved to reopen the case two years later. (D.I. 6.) The Commissioner filed a record with the court on August 5, 2010. (D.I. 9.) After Pringle moved for summary judgment, the Commissioner filed an amended record on July 19, 2011. (D.I. 12, 14.) The court then directed Pringle to file another motion based on the amended record. (D.I. 21.) Pringle argues the duplicate records and delays indicate "the record was still not complete, and that its integrity had been so compromised by delays, errors, and omissions, that no attempt at reconstruction could assure that the record presented to the court was the same record that was actually before ALJ Banas." (D.I. 22 at 5.) In response, the Commissioner contends Pringle's argument "appears to be nothing but a five-page diatribe criticizing the agency for a delay in certifying a complete administrative record in this matter, as well as an attempt to create confusion where there is none." (D.I. 27 at 13.)

Although the delays and renumbering of exhibits within the records may have created confusion or inconvenience, Pringle fails to point to any authority supporting the proposition that such confusion or inconvenience requires remand. Pringle had the opportunity to review both records and file timely motions accordingly. Further, all medical evidence on which the ALJ relied is readily discoverable within the record. Therefore, there exists no basis to remand this case based on the integrity of the record.

## V.    CONCLUSION

For the foregoing reasons, (1) Pringle's motion for summary judgment is granted

in part; (2) the Commissioner's motion for summary judgment is denied; (3) the decision

of the ALJ is reversed; and (4) the matter is remanded for further findings and

proceedings consistent with this Memorandum.

Dated: May 16, 2014

CHIEF, UNITED STATES DISTRICT JUDGE

33